STATE v. BASS.

4799                                              277 S. W. 2d 479

Opinion delivered April 11, 1955.

*Tom Gentry*, Attorney General, and *Thorp Thomas*, Assistant Attorney General, for appellant.

*Otis H. Nixon* and *Jackie Shropshire*, for appellee.

MINOR W. MILLWEE, Justice. Harry Bass and eight other defendants were charged in Little Rock Municipal Court with violating the provisions of Act 209 of 1939 [Ark. Stats., §§ 41-2024—41-2029] which prohibits the

possession and sale of lottery or policy tickets and certain other activities relating thereto. Each defendant was found guilty and a fine of $200 was assessed against Bass and fines of $50 to $100 against the other defendants. On appeal to Pulaski Circuit Court the cases were consolidated for trial before the court sitting as a jury.

At the trial in circuit court uncontradicted testimony was introduced by the State to the following effect. Little Rock detectives conducted a search of the office of defendant Bass where they found all the paraphernalia and equipment ordinarily used for conducting that form of lottery known as the "policy" or "numbers" game. Bass freely admitted the policy operation through an organization incorporated as "Citizens Mutual Hospital Association" in 1953 ostensibly for the purpose of promoting the construction and operation of a hospital for Negroes in Pulaski County. Bass became an officer of the Association and entered into a 10-year written contract with it whereby he was given the "exclusive right" to raise such construction funds from Negro citizens "by whatever means necessary" and to retain 40% of all funds received out of which he was to pay all costs of the fund raising operation.

Under the plan followed by the defendants only members of the hospital association were eligible to play "policy." Each prospective member signed an application which provided that neither he nor his beneficiary should be entitled to participate in "the beneficiary fund" until his application had been approved by the association. Bass employed 12 runners who solicited memberships and sold policy slips or tickets for drawings which were conducted twice daily from a box containing 72 capsules with numbers inside ranging from 1 to 72. A player could choose a number or combination of numbers and bet from 5 cents upward that his particular number or combination of numbers would be drawn. Odds ranged as high as 160 to 1. Each runner was provided with a ticket book which he used in soliciting and keeping a record of bets placed by each participating member and 25% of his "take-in" was retained by the

runner as compensation for his services. Bass kept a card file of the association membership upon which a daily record was kept of the amount of money wagered by each member. The ticket books, drawing slips and other materials admittedly used by the defendants in conducting the daily drawings were introduced.

After the arrest of Bass the other defendants were arrested and admitted their participation in the operation either as runners or active directors of the association. Defendants, Arthur Walls and Ben Williams, were identified by officers as "old policy writers" in the city of Little Rock. When asked the purpose of hiring these men Bass replied: "Well, in this racket it is easy to get gipped—you can get sucked in and Walls and Ben Williams know the policy racket and they know all the angles to keep from getting hooked." One witness who was not a member of the association testified that he "played policy" with one of the defendants several times and won $16 on one 10-cent bet.

The trial court held the foregoing uncontradicted evidence insufficient to sustain a conviction and ordered dismissal of the cases. The State has appealed and we agree with its contention that the court's action constituted reversible error. The games of "policy" and "numbers" are forms of petty gambling that have become more prevalent in this country in recent years and are generally patronized by those who can least afford to lose. *Motley* v. *Commonwealth*, 177 Va. 806, 14 S. E. 2d 28. There are many variations of these games but the *modus operandi* employed by the defendants in the case at bar follows the same general pattern as that found to exist in other places. In other jurisdictions with statutes or constitutional provisions [1] similar to our own these games have been uniformly held to constitute a lottery. See annotation in 105 A. L. R. 305.

The scheme used by defendants embodies all the elements of a lottery under the following definition ap-

---

[1] Art. 19, § 14 of the Arkansas Constitution reads:
"No lottery shall be authorized by this State, nor shall the sale of lottery tickets be allowed."

proved by this court in *Burks* v. *Harris,* 91 Ark. 205, 120 S. W. 979, 23 L. R. A. N. S. 626, 134 Am. St. Rep. 67: ''A lottery is a species of gaming, which may be defined as a scheme for the distribution of prizes by chance among persons who have paid, or agreed to pay, a valuable consideration for the chance to obtain a prize.'' Our statutes [2] place a special responsibility and duty upon circuit judges, prosecuting attorneys and other officers in connection with the enforcement of our gambling laws. The fact that defendants took over and used an organization originally dedicated to worthy purposes as a front for their illegal operations, or that some portion of the receipts might go for a charitable purpose, only tends to accentuate the flagrant and unwholesome character of the whole transaction.

The judgments are accordingly reversed and, since defendants could only be punished by fine under the statute, the cases will be remanded for a new trial. *State* v. *Czarnikow,* 20 Ark. 160. It is so ordered.

ROBINSON, J., not participating.

[2] See Ark. Stats., §§ 41-2017, 41-2019—41-2022.